# ZARETSKY LAW GROUP

**RICHARD P. ZARETSKY, ESQ.**
*Board Certified Real Estate Lawyer*
rpz@zaretskylaw.com

**A. MAX ZARETSKY, ESQ.**
mzaretsky@zaretskylaw.com

**DANIEL L. FRANKS, ESQ.**
dfranks@zaretskylaw.com

BARRISTERS BUILDING
1615 FORUM PLACE, SUITE 3A
WEST PALM BEACH, FLORIDA 33401
TEL. (561) 689-6660
TEL. (772) 237-0010 *(Martin / St. Lucie Counties)*
FAX (561) 683-1559
WWW.ZARETSKYLAW.COM

*of Counsel*

**MICHAEL A. LAMPERT, ESQ.**
*Board Certified Tax Lawyer*
*Also Admitted in Pennsylvania and Washington D. C.*

**ESTHER A. ZARETSKY, ESQ.**
*Also Admitted in New York*

**STEVEN L. WINIG, ESQ.**

January 24, 2018

Steven S. Newburgh, Esq.
McLaughlin & Stern
525 Okeechobee Boulevard
#1700
West Palm Beach, FL 33401

**Re: Fred Volkwein funds lost to Jeffrey Siskind**

Steven:

Below is a first person statement by my client, Fred Volkwein. Mr. Volkwein had dealings with Jeffrey Siskind over a 25 year period that eventually lead to a monetary loss to Mr. Volkwein of essentially all of his savings of over $1,200,000. Much of these monies were taken by Mr. Siskind from his law firm trust account. I present this first person statement pursuant to our discussions.

**A. The Loans**

I met Jeffrey Marc Siskind ("Siskind") in the late 1980's. At that time I was a successful and respected marine canvas maker (as a sole proprietor doing business in West Palm Beach, Florida, as "Dockside Canvas Company," "Dockside, Inc.") and I had a Coast Guard Captain's License. Mr. Siskind had a 50-foot sailboat that he wanted to take to Abaco, Bahamas. At his request, I acted as the captain and Mr. Siskind and three friends went along as crew. We became social friends and I considered him my personal lawyer. Like most scams, I "won" in the beginning.

Over drinks, I mentioned to Siskind that I had just bought 409-411 24th Street in West Palm Beach, using an attorney classmate who had since retired. Siskind mentioned that he did real estate closings and so I retained him for my purchase of 413 24th Street in October 1999 and for 524 24th Street in October 2001. These closings occurred with no glitches, on time closings and a $500 legal fee for each transaction.

**EXHIBIT 1**

On December 18, 2002, Siskind asked for a loan of $10,000, which he repaid (see Exhibit A attached). On June 26, 2006 at his request, I loaned Siskind $50,000 at 20% interest, secured by an Assignment of Proceeds of Mortgage and Interest Agreement dated June 26, 2006, on some real estate in Mebane, North Carolina upon which Siskind said he held a secured interest. Siskind drafted the agreement at 20% without telling me that 20% was an illegal rate of interest. The agreement states that Siskind will "individually guaranty repayment of principal and interest . . ..." Attached see Exhibit B. The mortgage was paid off in full. Siskind never suggested that I consult another lawyer before committing my money to his deals.

On August 6, 2007, I advanced Siskind $25,000 (check #09917) against a note signed by Siskind stating, "I own (sic) Fred Volkwein $25,000 plus interest @10%/year due Nov. 6, 2007" (Exhibit C attached). This loan was never repaid.

On or about September 14, 2007, I gave Siskind check #503 which was negotiated on September 19, 2007 for $11,000 and $4,000 cash on September 19th. On September 19, 2007, I advanced Siskind an additional $15,000 on the same terms as Exhibit C, (see Composite Exhibit D attached). This advance was never repaid.

On February 11, 2008, I gave Siskind check #1019 dated February 11, 2008 for $5,000, (Exhibit E attached). This advance remains unpaid.

On July 13, 2008, I issued check #504 for $3,600 as an additional advance. At Siskind's suggestion, I made the check out to cash and he cashed it, (Exhibit F attached). Note his Florida driver's license at the top of the check. He never signed or gave me a note. This loan remains unpaid.

On August 11, 2009, I made additional advances totaling $35,000 to Siskind, which Siskind confirmed in emails dated August 13th and 14th, 2009, (Composite Exhibit G attached), bringing the total loans to $93,600.

Some time during this period Mr. Siskind advised me that he was going through bankruptcy but advised me that I would not be listed as a creditor and thereby have my claims wiped out. I relied upon his legal expertise and did not do any independent research about the rules and results of bankruptcy filed by an attorney.

Despite being advised of his bankruptcy, I continued to succumb to Siskind's blandishments and appeals to our "friendship." On December 23, 2009, I loaned Siskind $12,000 against an unsecured note signed by him to repay the loan on or before January 16, 2010, (Exhibit H attached). On January 25, 2010, Siskind delivered check #1012 from his LLC, Siskind Legal Services, LLC for $12,000. The check bounced NSF on January 26, 2010, (Exhibit I attached), and this loan remains unpaid.

Undeterred by this experience, On December 31, 2009, I loaned Siskind $3,000 in cash against a hand-written memo in which he promised to repay me "plus bonus" by January 6, 2010. That same day he delivered a check for $3,000 to me which I deposited, without inquiring as to the "bonus" promised, (Exhibit J attached); this check cleared.

Siskind's requests for financial help slowed down thereafter. On April 16, 2010, I lent Siskind $10,000 without a note, (see check #10587 attached as Exhibit K). This loan remains unpaid.

On February 3, 2011, Siskind borrowed $2,500 on a note payable February 10, 2011, (Exhibit L attached). This loan remains unpaid.

On December 10, 2012, by check #1049 dated December 10, 2012, I loaned Siskind $10,000 (Exhibit M attached). This loan remains unpaid.

During this period, I would ask Siskind when I would be repaid. He put me off with excuse after excuse. Stung by Siskind's cavalier treatment of his unpaid debts to me, and vowing to protect my interests, when he requested a $50,000 loan, I told him it would only be made by me via a secured note. On November 28, 2012, he executed and delivered a note paying maximum legal interest and secured by an executed by a signed but undated Certificate of Title to a 1973 Jaguar motor vehicle to be stored in his residence garage. I was totally upset when Siskind advised me orally in 2016 that he had sold this automobile without telling me or repaying the loan. (See Composite Exhibit N attached). This loan remains unpaid.

On April 5, 2013, my single member limited partnership, Scupper Enterprises Limited Partnership, loaned Siskind's single member LLC, Aviatat, LLC, $25,000 on a note purportedly secured by a first secured lien on a Beechcraft Baron model C-55 airplane (serial no. TE-411, registered as N208GS) to be repaid in 60 days. Siskind delivered to me a check for $25,000 dated October 30, 2013, drawn on "Jeffrey M. Siskind Trust Account" which check was returned "NSF." (See Composite Exhibit O attached). This loan remains unpaid.

On July 7, 2013, Siskind executed a note evidencing a loan of $1,000. This loan remains unpaid. (See Exhibit P attached).

During the period December 23, 2008-July 7, 2013, I loaned Siskind a total of $108,000, bringing the total of unpaid loans to $201,600 plus accrued interest.

### B. Fraudulent Investment Scams

#### I. Sovereign Consulting

From time to time thereafter, over lunch or drinks in the evening (he always paid) he would talk about big money deals in which he was involved. He was aware that I had accumulated some capital, and over drinks, suggested that I consider investing with him.

In late 2004, he described a "wonderful" investment opportunity in Sovereign Consulting, LLC ("Sovereign"), an Oklahoma LLC which would operate a gambling casino on Indian land in Oklahoma. He gave me copies of:

Steven S. Newburgh  Page **4** of **9**
Volkwein Summary

  (1) Articles of Organization of Sovereign dated October 2, 2003, (Exhibit Q attached) executed by William L. Siskind, a Delaware attorney and Siskind's father, as Organizer & Resident Agent and by Siskind "for Enterprise Trust," and

  (2) Gaming Facility Development and Construction Agreement between The Delaware Nation of Oklahoma ("Delaware Nation") and Sovereign dated November 3, 2004, signed by Siskind as President of Sovereign (Exhibit R attached).[1]

  Siskind recommended that I invest a total of $200,000 (in installments over time) in Sovereign in connection with the construction of a gambling casino to be built in Oklahoma, for which I would receive 5 shares representing 5% of the "equity" in Sovereign. Siskind gave me an undated and unsigned "Business Plan Synopsis", (Exhibit S attached) for development of a truck stop and entertainment lounge (with gambling) on land owned by The Delaware Nation in and near Biscuit Hill, Oklahoma. While this 16-page Synopsis states it "does not constitute a formally . . . approved business plan" it contains 5-year income projections similar to projections in a prospectus.[2]

  On March 23, 2004, Siskind signed and gave me a note acknowledging receipt of $10,000 from me "toward purchase of 1 share of Sovereign Consulting LLC stock; $30,000 paid to date, $10,000 due." (See Exhibit T attached). On April 16, 2004, I gave Siskind check #8471 (Exhibit U attached) drawn on the First Union National Bank of Florida checking account of Dockside Canvas Company (of which I am the sole shareholder) for $5,000.00, payable to Jeffery (*sic*) M. Siskind Trust Account. On May 5, 2004, Sovereign issued Stock Certificate No. 11, signed by Siskind as President for one (1) share in my name (See Exhibit V attached).

  I cannot find my subsequent $5,000 check to total the $40,000 for the 1 share, but the stock certificate was issued May 5, 2004 as evidenced by the stock certificate (Exhibit V). I cannot find my subsequent $40,000 payment but on February 7, 2006 the next stock certificate was issued to me, (Exhibit W attached). Each stock certificate is signed by Jeffrey Siskind as President.

  When in early 2007 I complained to Siskind about the lack of information about my Sovereign investment, he told me that "difficulties" had arisen and gave me a copy of a letter dated February 7, 2007, from Siskind to Kerry Hulton, the President of The Delaware Nation, enclosing a copy of a letter dated April 7, 2006 from William L. Siskind, Siskind's father, to an attorney in Sioux Falls, South Dakota describing the time and money spent by Sovereign, and an e-mail from Mr. Hulton, in which he says "you will realize those hopes very soon . . ." (See Composite Exhibit X attached). He also gave me a thick brochure (Exhibit Y attached) the cover of which is dated December 20, 2004, containing, among other things, a welcome letter from Siskind, "Sovereign's President," an "update" updated October 8, 2007, of the "Delaware Tribe Litigation" in which Siskind states Sovereign's "contract with the Tribe will be upheld," and

---

[1]   A fully executed copy of this agreement in found in Exhibit Y.
[2]   I relied on Siskind for the "legalities" in connection with my investment in Sovereign. I have since learned that Sovereign never qualified to do business in Florida and never registered with the SEC to do private placements.

Sovereign "is confident that it will be successful in maintaining jurisdiction over its contract before the Oklahoma Court . . . in order to assure that all future profits are paid and received in accordance with its terms." (See Exhibit Y-1 attached).

Relying upon Siskind's representations of "future profits," on July 9, 2007, I gave Siskind a $40,000 check, (Exhibit Z attached) as an additional investment in Sovereign LLC, on his oral assurance that this was on the same terms as the original investment (i.e., $200,000 for 5 shares representing 5% of the equity). In an e-mail sent to me dated July 30, 2007, (Exhibit AA attached), Mr. Siskind confirmed my $200,000 investment and stated he would "*stand as guarantor* in the event the project is terminated fro (*sic*) any reason." No part of this guarantee has been honored.

Sovereign never got off the ground and Siskind offered to use the money he owed me as an investment on my account in another company of his called Collective Management Associates, LLC (CMA), a Florida LLC, which would deal in growing legal cannabis or marijuana in California with the stated goal of obtaining "significant market share in an industry which we believe has become . . . our Nation's #1 growth business over the next decade." (See Composite Exhibit BB, page 3). CMA had a short life: Articles of Organization were electronically filed June 5, 2009, and administratively dissolved by the State on September 23, 2011. CMA apparently was a shell company solely owned and operated by Siskind.

In meetings between 2008 and 2009 I would complain to Siskind that he owed me well over $300,000 between the Sovereign investment and the loans listed above. Siskind would verbally admit he owed me money but would deflect my repeated requests to "put it in writing." Finally, in an e-mail exchange dated August 13 and 14, 2009, Mr. Siskind purported to cap his aggregate debt at $80,000 (later corrected by Mr. Siskind to $100,000), ignoring his "guarantee" with respect to the $200,000 obligation on his Sovereign guarantee. (See Composite Exhibit G (pages 1 and 2)). At the time I was willing to settle for $100,000 plus accrued interest @10% for the period between the various loans and repayment. Siskind purported to sweeten the deal by saying in his August 13, 2009 email, "In addition to repayment of these amounts, Fred Volkwein shall receive 5,000 shares (equal to 1% of the outstanding shares of Collective Management Associates, LLC from Jeffrey Siskind." (See Composite Exhibit G).

Despite the fact that I never knowingly invested in CMA, for the tax year 2010, I received a single K-1 from CMA showing small losses, (Exhibit CC attached), but I never received any subsequent K-1s from CMA. I did not notice the source of the K-1 at the time so I never inquired about it. Around 2015 or 2016, Mr. Siskind advised me that CMA had folded (in fact I have since learned later it had been dissolved in 2011) and offered, instead of repaying me, to "roll over" an unstated amount into a new Maryland venture. I got some paperwork on the proposed venture but nothing else. I have mislaid or discarded this paperwork. I was beginning to feel I would never see my "investment" again.

### C. Fraudulent Diversion of Attorney Escrow Funds / Insufficient Escrow Funds

In the spring of 2014, I decided to retire and retained Corcoran Group Real Estate as my broker. Real estate agent Bill Reiss came to me with a proposal to sell 409, 411 and 413 24th

Streets and 2505 North Dixie (the "Northwood properties"). The Northwood properties were contiguous to property he had just sold to a third party. I told Reiss that I wanted to include 524 24th Street as part of a package deal. The deal was made and Siskind handled the contract review and documents. At that time no mention was made of his fee.

On July 25, 2014, I signed a contract to sell these properties to North Dixie Ventures, LLC, for $1,375,000. (See Exhibit DD attached). Thereafter, Siskind said I could defer payment of the substantial capital gains tax that would otherwise be due in the event of a straight sale and suggested that I switch to a Section 1031 like-kind exchange, claiming that he had handled Section 1031 exchanges in the past and could take care of all necessary paperwork on my behalf. He said he just happened to own a company, Chance & Anthem, LLC ("Chance") which could act as the intermediary to facilitate this transaction. He also said he would not charge an attorney's fee for the transaction.

Siskind never explained to me the requirements for a like-kind exchange, especially that I would end up owning "equivalent real estate" instead of cash, and never disclosed that the intermediary must be a "Qualified Intermediary" (QI), and that Chance could not qualify as a QI. I now know that the IRS code is clear on the fact that a QI has to be an independent organization whose only contact with the exchange is to serve him as a QI. (See Composite Exhibit EE attached). I also now know that Siskind had set up Chance on October 9, 2014 as a single member LLC. (See Exhibit FF attached). Siskind also never advised me that a Fidelity Bond Insurance policy was required and never offered to give me a copy of any such policy.

Relying on Siskind's alleged expertise, I executed a 1031 Exchange Assignment Agreement, drafted by Siskind, under which I agreed to assign all my rights to the four properties to Chance & Anthem, (Exhibit GG attached). The Seller's Settlement Statement dated November 3, 2014, (Exhibit HH attached), states that the net proceeds of $1,157,623.77 would be delivered to "Seller" (now Chance) at closing. When I reviewed the seller's closing statement, I noticed that Siskind had the title company pay him a $5,000 attorney fee despite his promise to provide legal services for nothing. He said he needed the money and I let it go in view of the substantial net proceeds.

On or about November 3, 2014, Siskind instructed First American to disburse from its escrow account $50,000 to "Seller" and the balance to Chance. (See Exhibit II attached). I never saw any of the net proceeds since the "Seller" was Chance pursuant to Exhibit GG. See Exhibit II in which Siskind so states.

As of December 23, 2014, I thought I had in excess of $750,000 remaining from the net proceeds of the sale, all of which were being held in Siskind's escrow account. I did not know that in fact, these funds were held by Chance. Siskind then suggested that I put part of the proceeds into buying and fixing up a house he owned in Wellington that needed renovation and in which his parents were living. When I next asked about how the house investment was doing, Siskind told me that he had instead "moved that money into another house located next door to his residence in Wellington." Siskind was giving me oral updates on how the reconstruction was coming along. When I said I wanted to see it, Siskind showed me the house. While the house was relatively new, a lot of water damage and mold was apparent. Siskind said one delay after

another prevented its sale. It appeared to me that Siskind had grandiose plans for this house: taller doors throughout the house, upstairs patio, moving walls. I said no new design or construction, button up the property and sell it. He initially agreed, then said another investor wanted a larger garage, then he had "problems" with an engineer and his drawings.

After repeated requests for an accounting of the net proceeds of the sale of the Northwood Properties, in April 2017, Siskind submitted an undated hand-written "Recap", (Exhibit JJ attached). In the Recap, Siskind takes proper credit for paying $400,000 to purchase an annuity in my name from Jackson Annuity, and $90,000 to my accountant to be used to pay income taxes on the "boot" in the purported tax-deferred exchange. However he could not account for two or three large amounts and asked me if I knew what they were for! There is no explanation for claiming $58,000 for "Exp.," $65,092.40 for "holdback release," $15,500 for "City of W.P.B. Reimbursement" and "insurance" payments are unexplained. The claim to have paid $135,109.92 for "Toy Store Unit Purchase," is false since this transaction was paid for by with other funds. The claims to have paid $500,000 for "Wellington Project" and $25,000 for "loan to Cannamed" (for his Maryland cannabis project), are false, since I never consented to either transaction. I was shocked and angry that according to Siskind's Recap, there was no money left in the attorney escrow account. It was zeroed out!

All through the period 2014-2016, Siskind would invite me for lunch or after work drinks to update me on events and would always pick up the tab. Several times he gushed about how good of a friend I was by not hounding him about monies owed to me and would promise that the cannabis project would throw off more than enough money to repay me handsomely. He described three different cannabis projects, each of which had failed. I told him in unequivocal terms that I did not want to make any new investments and expected him to pay the balance of the net proceeds, which should exceed $635,000. Siskind would say "That much! It will come back", and words to that effect.

In May 2017 Siskind told me he had "moved my money to his residence" and would give me a promissory note of $500,000 backed by an "interest in real property" Siskind explained that this "interest" would relieve him from paying doc stamps. A problem with this is that Siskind's home in Wellington is his marital residence, and subject mortgages well in excess of the value of his home. His wife did not sign any document relating to my "security". Siskind never advised me of the need of having his wife also sign the collateral pledge because of the Florida homestead protections.

### D. Fraudulent Legal Representation:

The thefts by Siskind were hidden and not revealed to me. This is now apparent from a failed real estate transaction. In the fall of 2014, Jay Goldwasser ("Goldwasser"), the owner of 2501 North Dixie (Fish Store), approached me to buy this property. We agreed on a price of $198,000 and I engaged Siskind to handle the documents and transactions. On October 13, 2014, we executed a Contract for Sale and Purchase. Closing was set for "on or before the sixtieth day after the effective date…" (calculated as December 15, 2014). Buyer will procure title insurance at its expense. (See Exhibit KK attached). By letter dated October 15, 2014,

Siskind advised Goldwasser that he was "holding the sum of $6,000" pursuant to Exhibit KK (See Exhibit LL attached).

On or about December 15, 2014, I received a call from Mr. Goldwasser that Siskind had not produced the executed closing documents and checks and that the deal was off. I called Siskind who claimed that the title company had not forwarded all the documents and that when he tried to reach the seller's attorney, Jonathan Berkowitz, of Cohen, Morris, Wolmer, Ray, Telepman & Cohen, at 4:50 P.M. on the closing date to arrange a postponement of the closing, the call was not picked up. Siskind also claimed that the deed was not proper; the company that owned the Fish Store was not listed as current in Sunbiz, and therefore could not close; and that Goldwasser created a similar name with Sunbiz to avoid paying penalties and late fees. Siskind never satisfactorily explained why these problems were not brought to the attention of the seller's attorney and resolved long before the closing date.

I filed suit to recover my earnest money. I retained Siskind because he said he would bear all litigation expenses. After mediation, Goldwasser and I executed a Mediation Settlement Agreement dated April 14, 2015 under which I agreed to increase the price to $228,000, Seller agrees to resolve all title issues, Buyer (i.e., Siskind) will prepare all Closing Documents and tender them on or before May 15, 2015, and the court retained jurisdiction to enforce the revised terms and conditions of sale. Upon request of Berkowitz to have Siskind provide proof of funds for the purchase of the real estate, Siskind provided an escrow statement for an entirely different client and real estate escrow. A compilation of the related documents for the failed real estate transaction is contained in Composite Exhibit MM.

Somehow, the new closing date was missed and the case went back to court. To this day Siskind has never explained what happened to the $6,000. A review of the files of that closing and litigation and discussion with the Seller's attorney Jonathan Berkowitz reveals that there was no reason the closing did not occur except that Siskind did not want it to occur.

### E. Conclusion

Since May 2017 I have had no dealings with Siskind, except conversations in which he continually deflected my demands for repayment of all his debts to me, which in my estimation, exceed $759,000 of monies that should be in his escrow account from the Northwood Property, $75,000 of funds given to him that should have been in his escrow account, pending proper collateralization, $200,000 "investment" in Sovereign or Collective, in violation of securities laws, plus interest, and $201,600 in unpaid loans plus accrued interest.

I did not realize how badly I had been snookered by Siskind until May 2107 when a friend referred me to attorney Stephen L. Seftenberg. For a long time I believed that Siskind had integrity and I did not (or refused to) see or recognize the repeated warning signs from deceptive actions and "failed" transactions. For instance, he once told me that he was keeping me out of his bankruptcies and that as a result, "all my monies were good," and loans would be repaid from gaming or cannabis proceeds. Each time we met, he would explain why there was no money coming in (never his fault) or describe a wonderful new opportunity. He repeatedly told me my

investments were always safely carried forward. Yet he never provided any paper work indicating how this was being (except Exhibit JJ), Siskind's "word."

I hope this is helpful.

Very truly yours,

ZARETSKY LAW GROUP

Richard P. Zaretsky, Esq.